**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| P. ALEXANDER ATAII, Derivatively on Behalf of 3D SYSTEMS CORPORATION,<br><br>　　　　　　Plaintiff,<br>　　v.<br><br>JEFFREY A. GRAVES, JEFFREY D. CREECH, MALISSIA R. CLINTON, CLAUDIA N. DRAYTON, THOMAS W. ERICKSON, JIM D. KEVER, CHARLES G. MCCLURE, JR., KEVIN S. MOORE, and VASANT PADMANABHAN,<br><br>　　　　　　Defendants,<br><br>　　-and-<br><br>3D SYSTEMS CORPORATION, a Delaware Corporation,<br><br>　　　　　　Nominal Defendant. | Case No.: 1:25-cv-<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>JURY TRIAL DEMANDED |

**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR VIOLATION OF
SECURITIES LAW, BREACH OF FIDUCIARY DUTY, AND UNJUST ENRICHMENT**

Plaintiff, by his attorneys, submits this Verified Stockholder Derivative Complaint for Violation of Securities Law, Breach of Fiduciary Duty, and Unjust Enrichment. Plaintiff alleges the following on information and belief, except as to the allegations specifically pertaining to plaintiff, which are based on personal knowledge. This Complaint is also based on the investigation of plaintiff's counsel, which included, among other things: (i) a review and analysis of public filings with the U.S. Securities and Exchange Commission ("SEC"), news reports, press releases, and other relevant publicly available sources; and (ii) pleadings, papers, and any documents filed in the related

pending securities fraud class action captioned *Herbermann v. 3D Systems Corporation, et al.*, Case No. 1:25-cv-00734-GBW (D. Del. June 13, 2025) (the "Securities Class Action").

## NATURE AND SUMMARY OF THE ACTION

1.      This is a stockholder derivative action brought by plaintiff on behalf of 3D Systems Corporation ("3D Systems" or the "Company") against certain of its current officers and directors for their violations of section 14(a) of the Securities Exchange Act of 1934 ("Exchange Act"), breaches of fiduciary duty, unjust enrichment, and violations of law.  These wrongs resulted in significant damages to 3D Systems' reputation, goodwill, and standing in the business community, as well as exposing the Company to potential liability for violations of state and federal law.

2.      3D Systems is a global provider of three-dimensional ("3D") printing and digital manufacturing solutions, including 3D printers for plastics and metals, 3D scanners, materials, software, on-demand manufacturing services, and digital design tools.  3D Systems' products are used primarily in health care services and manufacturing.  The Company earns revenue from the sale of products and services through its two operating segments: Healthcare Solutions and Industrial Solutions.  The Healthcare Solutions segment includes dental, medical devices, personalized health services, and regenerative medicine (the "Regenerative Medicine Program"). The Regenerative Medicine Program focuses on "the use of additive manufacturing for human organ transplantation," and its success is critical to the future of the Company.

3.      Over the past several years, reduced customer spending has resulted in weakened sales across the 3D printing industry.  Nonetheless, 3D Systems has consistently maintained that "despite a challenging operating environment," it "remain[s] optimistic about the future" given its "sequential recovery and continued momentum in [its] robust customer pipeline." Further, the Company has touted that "[w]ith [its] new products now gaining traction in the market, [its] focus

is increasingly centered on driving gross margin expansion and operating expense improvements in the face of continuing uncertainty in the global markets." These statements about the Company's business health in the face of reduced customer spending were false and misleading, deceiving stockholders into believing that the Company remained on track to meet its forecasts.

4.    As it relates to the Company's Regenerative Medicine Program, since 2018, 3D Systems has partnered with biotechnology company United Therapeutics Corporation ("UTC") "with a long-term goal of developing the capability to 3D print lungs that will allow patients with end-stage lung disease to receive transplants that will enable them to enjoy long and active lives" (the "UTC Partnership").  The terms of the UTC Partnership include specific "milestone criteria"— i.e., requirements that must be met for a stage in a development process to be considered completed. In late 2024, 3D Systems updated the UTC Partnership's milestone criteria in response to changes in testing methodology.

5.    The Company earns milestone payments from UTC based upon the achievement of agreed-upon contract objectives (i.e., milestones).  Because these payments are contingent on future events, they generally represent a form of variable consideration.  Accounting Standards Codification ("ASC") 606-10-32-5—a uniform framework for recognizing revenue from contracts with customers—requires an entity to estimate the amount of variable consideration to which it will be entitled under a contract.  Accordingly, when 3D Systems and UTC updated the milestone criteria in 2024 due to changes in testing methodology, the Company was required to also update its estimates of the timing and probability that it will receive milestone payments when accounting for recognized revenue.  The defendants, however, failed to disclose that the updated milestone criteria would have a material negative impact on 3D Systems' revenue.

6.      On March 26, 2025, 3D Systems issued a press release announcing its financial results for the fourth quarter and full year ended December 31, 2024.  In the press release, 3D Systems reported fourth quarter non-Generally Accepted Accounting Principles ("GAAP") earnings per share ("EPS") of -$0.19, missing consensus estimates by $0.08 per share.  3D Systems also reported sales revenue of $111 million, representing a -3.4% year-over-year decline and missing consensus estimates by $4.17 million.  For the full year, 3D Systems reported sales of $440.1 million, a 10% year-over-year decrease from 2023, which was driven by "lower hardware systems sales due to macroeconomic factors that are negatively impacting demand."  Finally, 3D Systems reported a "$9 million revenue reduction in [the fourth quarter] driven by a change in accounting estimates for [the Company's] Regenerative Medicine program."  The Company disclosed that "[t]his change in estimate [was] related to the now anticipated use of pre-clinical human decedent testing, ... which led to refinement of the milestone technical criteria."

7.      On this news, 3D Systems' stock plunged $0.57 per share, or 20.9%, on March 27, 2025, to close at $2.15 per share compared to the previous day's closing of $2.72 per share, erasing over $77.2 million in market capitalization in a single day.

8.      After the market closed on May 12, 2025, 3D Systems issued a press release announcing its financial results for the first quarter ended March 31, 2025.  In the press release, 3D Systems reported revenue of $94.5 million, missing consensus estimates by $5 million, and down 8% year-over-year.  3D Systems also reported a net loss of $37 million, or $0.28 per share, more than doubling the $16 million net loss reported in the prior year.  The press release further reported an adjusted loss of $0.21 per share, $0.07 worse than consensus estimates of $0.14 loss per share, and adjusted earnings before interest, taxes, depreciation, and amortization ("EBITDA") loss of $23.9 million, a 18.9% increase in year-over-year quarterly losses from the prior year.  The

Company attributed its disappointing results, in part, to a decline in material sales, mostly due to inventory management issues in the dental portion of its Healthcare Solutions segment.  3D Systems also announced that it was withdrawing its full-year 2025 outlook, citing prolonged softness in customer capital spending and macroeconomic uncertainty.

9.      On this news, 3D Systems' stock plunged $0.68 per share, or 26.6%, on May 13, 2025, to close at $1.87 per share compared to the previous day's closing of $2.55 per share, erasing over $92.7 million in market capitalization in a single day.

10.     Further, as a direct result of the unlawful conduct alleged herein, 3D Systems is now the subject of the Securities Class Action filed on behalf of 3D Systems investors in the U.S. District Court for the District of Delaware.

## JURISDICTION AND VENUE

11.     Pursuant to 28 U.S.C. §1331 and section 27 of the Exchange Act, this Court has jurisdiction over the claims asserted herein for violation of section 14(a) of the Exchange Act (15 U.S.C. §78n(a)) and SEC Rule 14a-9, promulgated thereunder (17 C.F.R. §240.14a-9).  This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. §1367.  This Court additionally has jurisdiction over this action under 28 U.S.C. §1332 in that plaintiff and defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.  This action is not a collusive one to confer jurisdiction on a court of the United States that which it would not otherwise have.

12.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of

jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

13.    Venue is proper in this Court in accordance with 28 U.S.C. §1391 because a substantial part of the events, omissions, wrongs, transactions, and acts complained of and giving rise to the claims asserted herein, including defendants' involvement in the same as detailed herein, occurred in this District.  Additionally, the Company is incorporated in this District, and defendants have received substantial compensation by engaging in business that had an effect in this District.

## THE PARTIES

**Plaintiff**

14.    Plaintiff P. Alexander Ataii was a stockholder of 3D Systems at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current 3D Systems stockholder.  Plaintiff is a citizen of California.

**Nominal Defendant**

15.    Nominal defendant 3D Systems is a Delaware corporation with principal executive offices located at 333 Three D Systems Circle, Rock Hill, South Carolina.  Accordingly, 3D Systems is a citizen of Delaware and South Carolina.  3D Systems markets products and services through subsidiaries in North America and South America, Europe and the Middle East, and Asia Pacific and Oceania.  3D Systems provides 3D printing and digital manufacturing solutions, including 3D printers for plastics and metals, materials, software, and services, including maintenance, advanced manufacturing and applications engineering.  3D Systems has two reportable segments: Healthcare Solutions and Industrial Solutions.  As of December 31, 2024, 3D Systems had 1,833 full-time and part-time employees.

**Defendants**

16.    Defendant Jeffrey A. Graves ("Graves") has been 3D Systems' President and Chief Executive Officer ("CEO") since May 2020, and a director since June 2020.   Defendant Graves is named as a defendant in the related Securities Class Action that alleges he violated sections 10(b) and 20(a) of the Exchange Act.  3D Systems paid defendant Graves the following compensation as an executive:

| Year | Salary | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2024 | $849,800 | $1,252,062 | $24,894 | $2,126,756 |

Defendant Graves is a citizen of North Carolina.

17.    Defendant Jeffrey D. Creech ("Creech") has been 3D Systems' Executive Vice President and Chief Financial Officer since December 2023.  Defendant Creech is named as a defendant in the related Securities Class Action that alleges he violated sections 10(b) and 20(a) of the Exchange Act.  3D Systems paid defendant Creech the following compensation as an executive:

| Year | Salary | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2024 | $425,000 | $417,352 | $2,515 | $844,867 |

Defendant Creech is a citizen of South Carolina.

18.    Defendant Malissia R. Clinton ("Clinton") has been a 3D Systems director since March 2019.  3D Systems paid defendant Clinton the following compensation as a director:

| Fiscal Year | Fees Earned or Paid (Cash) | Stock Awards | Total |
|---|---|---|---|
| 2024 | $87,500 | $135,000 | $222,500 |

Defendant Clinton is a citizen of Arizona.

19.    Defendant Claudia N. Drayton ("Drayton") has been a 3D Systems director since December 2021.  Defendant Drayton has been the Chair of 3D Systems' Audit Committee since at least April 2025 and a member of that committee since at least August 2024.  3D Systems paid

defendant Drayton the following compensation as a director:

| Fiscal Year | Fees Earned or Paid (Cash) | Stock Awards | Total |
|---|---|---|---|
| 2024 | $78,207 | $135,000 | $213,207 |

Defendant Drayton is a citizen of Minnesota.

20.    Defendant Thomas W. Erickson ("Erickson") has been a 3D Systems director since November 2015.  Defendant Erickson has been a member of 3D Systems' Audit Committee since at least April 2025.  3D Systems paid defendant Erickson the following compensation as a director:

| Fiscal Year | Fees Earned or Paid (Cash) | Stock Awards | Total |
|---|---|---|---|
| 2024 | $76,712 | $135,000 | $211,712 |

Defendant Erickson is a citizen of Texas.

21.    Defendant Jim D. Kever ("Kever") has been a 3D Systems director since May 1996. 3D Systems paid defendant Kever the following compensation as a director:

| Fiscal Year | Fees Earned or Paid (Cash) | Stock Awards | Total |
|---|---|---|---|
| 2024 | $67,935 | $135,000 | $202,935 |

Defendant Kever is a citizen of Tennessee.

22.    Defendant Charles G. McClure, Jr. ("McClure") has been 3D Systems' Chairman of the Board of Directors (the "Board") since October 2018 and a director since March 2017.  3D Systems paid defendant McClure the following compensation as a director:

| Fiscal Year | Fees Earned or Paid (Cash) | Stock Awards | Total |
|---|---|---|---|
| 2024 | $250,000 | $135,000 | $385,000 |

Defendant McClure is a citizen of Michigan.

23.    Defendant Kevin S. Moore ("Moore") has been a 3D Systems director since October 1999.  Defendant Moore has been a member of 3D Systems' Audit Committee since at least August 2024. 3D Systems paid defendant Moore the following compensation as a director:

| Fiscal Year | Fees Earned or Paid (Cash) | Stock Awards | Total |
|---|---|---|---|
| 2024 | $95,000 | $135,000 | $230,000 |

Defendant Moore is a citizen of Connecticut.

24. Defendant Vasant Padmanabhan ("Padmanabhan") has been a 3D Systems director since December 2020. 3D Systems paid defendant Padmanabhan the following compensation as a director:

| Fiscal Year | Fees Earned or Paid (Cash) | Stock Awards | Total |
|---|---|---|---|
| 2024 | $72,500 | $135,000 | $207,500 |

Defendant Padmanabhan is a citizen of Massachusetts.

25. The defendants identified in ¶¶16-17 are referred to herein as the "Officer Defendants." The defendants identified in ¶¶16, 18-24 are referred to herein as the "Director Defendants." The defendants identified in ¶¶19, 20, 23 are referred to herein as the "Audit Committee Defendants." Collectively, the defendants identified in ¶¶16-24 are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

26. By reason of their positions as officers, directors, and/or fiduciaries of 3D Systems, and because of their ability to control the business and corporate affairs of 3D Systems, the Individual Defendants owed and owe the Company and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care, and were required to use their utmost ability to control and manage 3D Systems in a fair, just, honest, and equitable manner. The Individual Defendants were required to act in furtherance of the best interests of 3D Systems and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interest or benefit.

27.    The directors and officers of the Company owed and owe to 3D Systems and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

28.    To discharge their duties, the officers and directors of 3D Systems were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of 3D Systems were required to, among other things:

(a)    properly and accurately guide stockholders and analysts as to the true business practices, operations, financials, financial prospects, compliance policies, and internal controls of the Company at any given time, including making accurate statements about the Company's business practices, operations, financials, financial prospects, compliance policies, and internal controls;

(b)    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority, and disseminating truthful and accurate statements to the investing public so that the market price of the Company's stock would be based on truthful and accurate information;

(c)    conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock; and

(d)    remain informed as to how 3D Systems conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable

inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

**Breaches of Duties**

29.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to 3D Systems and its stockholders the fiduciary duties of loyalty and good faith, and the exercise of due care and diligence in the management and administration of the affairs of 3D Systems, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of 3D Systems, the absence of good faith on their part, and a reckless disregard for their duties to 3D Systems and its stockholders that the Individual Defendants were aware, or should have been aware, posed a risk of serious injury to 3D Systems.

30.     The Individual Defendants each breached their duties of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to make false and/or misleading statements that misled stockholders into believing that disclosures related to the Company's financial and business prospects were truthful and accurate when made.

31.     In addition, because of the Individual Defendants' illegal actions and course of conduct, the Company is now the subject of the Securities Class Action that alleges violations of the federal securities laws.  As a result, 3D Systems has expended, and will continue to expend, significant sums of money to rectify the Individual Defendants' wrongdoing.

**Additional Duties Pursuant to 3D Systems' Corporate Governance Guidelines and Code of Conduct**

32.     3D Systems holds its directors, as fiduciaries, to specific corporate governance principles beyond the requirements of law.

33.    In particular, the Company's Corporate Governance Guidelines in effect since December 14, 2024, specify the Board's duties, including its active oversight of the Company's business affairs.  Under the Corporate Governance Guidelines, the Board is charged with overall responsibility to "provide[] direction for the management of the business and affairs of the corporation."  In particular, among other things, the Board must:

(a)    "[n]ominate[] directors and establishes procedures for effective corporate governance";

(b)    "[o]versee[] the financial reporting process, communications with stockholders, and the corporation's legal and regulatory compliance program";

(c)    "[r]eview[][] the major risks facing the corporation and provides guidance to management to develop strategies to address these risks";

(d)    "[o]versee[] the selection, retention and compensation of qualified senior executives"; and

(e)    "[a]dvise[] management on significant issues facing the corporation."

34.    The Individual Defendants, as officers and directors of 3D Systems, also are bound by the Company's Code of Conduct.  The Code of Conduct sets out basic principles to guide all directors, officers, and employees of 3D Systems, who are required to know and conduct themselves in accordance with the Code of Conduct, as well as applicable laws and regulations, and to avoid the appearance of improper behavior.  With respect to the Company's compliance with laws, rules, and regulations, the Code of Conduct states that "[e]thical decision making is essential to the success of 3D Systems" and that "3D Systems is committed to the highest standards of ethical business conduct[.]"  In particular, "[e]ach and every employee of the Company and its subsidiaries

throughout the world is responsible for the maintenance of our fine reputation," including the following:

We expect all employees, officers, and directors, and anyone doing business on behalf of 3D Systems, to act in accordance with the principles in our Code and all applicable laws and regulations. We expect employees and officers of the Company to understand and follow our Code[.]

\*       \*       \*

3D Systems' legal, compliance, and ethical obligations and the situations we encounter go far beyond what is included in this Code. We must comply with both the letter and spirit of this Code, 3D Systems' policies, and the many global laws and regulations that affect our business. It is your responsibility to have familiarity with the principles of the laws that affect your job and to assist 3D Systems in complying with such laws.

35.     With respect to the Company's corporate books, financial accounting, internal controls, and public disclosure, the Code of Conduct states as follows:

We all play a role and are accountable for maintaining records that are consistently truthful, reliable, and transparent. We must also conduct our financial oversight and approval processes with the highest standards of integrity.

\*       \*       \*

Accurate financial reporting is essential to our Company's integrity and success. It requires meticulous attention to detail and unwavering accuracy in our processes, systems, and internal controls that support financial data.

Each employee plays a critical role in this process, ensuring that every piece of financial information—whether it is a purchase order, invoice, expense report, payroll record, sales data, and more—is handled with the highest level of precision and care.

\*       \*       \*

[Employees shall] [r]aise questions and report concerns for matters you become aware of such as:

- Errors in the preparation, evaluation, review, or audit of our financial statements.
- Errors in the recording and maintenance of our financial records.
- Deficiencies or noncompliance with our internal accounting controls.
- Misrepresentation or false statements regarding a matter contained in our financial records, financial reports, or audit reports.
- Deviation from full or fair financial reporting.

- Altering, deleting, or destroying of records due to concerns about potential litigation, audits, or investigations.

**Code of Ethics for Senior Financial Executives and Directors**

36.    3D Systems also maintains a separate Code of Ethics for Senior Financial Executives and Directors ("Code of Ethics"), which supplements the Code of Conduct and is designed to:

> [P]romote (i) honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest; (ii) full, fair, accurate, timely and understandable disclosure in 3D Systems' periodic reports and other documents filed with the [SEC] or in other public communications; (iii) compliance with applicable governmental laws, rules and regulations; (iv) internal reporting of violations of this Code of Ethics to an appropriate person as identified herein; and (v) accountability and adherence to this Code of Ethics.

37.    Among other things, the Code of Ethics states that "3D Systems' policy is to comply with all applicable financial reporting and accounting regulations applicable to the company."  The Code of Ethics further requires that all Company disclosures and reports pursuant to the federal securities laws and New York Stock Exchange ("NYSE") regulations "must comply with all applicable SEC, NYSE and other legal requirements."  To ensure compliance, the Code of Ethics states:

> The company has adopted certain disclosure controls and procedures in connection with its reporting and other public disclosures. Each senior financial executive must strictly adhere to such controls and procedures. All senior financial executives must ensure that such reports and disclosures are (i) full, fair, accurate, timely and understandable and (ii) meet all legal and NYSE requirements. These requirements apply to all public disclosures of material information about the company, including written disclosures, oral statements, visual presentations, analyst and press conferences, and media and investor calls.

**Control, Access, and Authority**

38.    The Individual Defendants, because of their positions of control and authority as directors and/or officers, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

- 14 -

39.     Because of their advisory, executive, managerial, and directorial positions with 3D Systems, each of the Individual Defendants had access to adverse, nonpublic information about the financial condition, operations, and improper representations of 3D Systems.

40.     At all times relevant hereto, each of the Individual Defendants was the agent of the other defendants and of the Company and were at all times acting within the course and scope of such agency.

**Reasonable and Prudent Supervision**

41.      To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the Individual Defendants were required to, among other things:

(a)     manage, conduct, supervise and direct the business affairs of the Company in accordance with all applicable laws;

(b)     neither violate, nor knowingly permit any officer, director, or employee of the Company to violate, applicable laws, rules and regulations;

(c)     establish and maintain systematic and accurate records and reports of the business and affairs of the Company and procedures for the reporting of the business and affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(d)     neither engage in self-dealing, nor knowingly permit any officer, director or employee of the Company to engage in self-dealing;

(e)    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(f)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(g)    ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times; and

(h)    remain informed regarding how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

**Additional Duties of the Audit Committee Defendants**

42.    In addition to the duties identified above, under the Audit Committee Charter, the Audit Committee Defendants, defendants Drayton, Erickson, and Moore, owed specific duties to 3D Systems to assist the Board in overseeing the integrity of the Company's financial statements and the Company's compliance with legal and regulatory requirements, among other things.  In particular, the Audit Committee Charter states as follows:

> The purpose of the Audit Committee shall be to assist the Board in fulfilling its responsibility for oversight of the quality and integrity of the accounting and reporting practices of the Company, the adequacy of the Company's financial and accounting policies, the qualifications and independence of the firm of independent registered public accountants engaged to prepare or issue an audit report on the financial statements of the Company and a report on the internal controls of the Company (the "independent auditor"), performance of the internal auditor, and the Company's processes to manage financial risk and compliance with significant applicable legal, ethical, and regulatory requirements.

43.     The Audit Committee's specific duties pursuant to the Audit Committee Charter

include:

8.  Participate (either the Chairman of the Committee and/or the Committee as a whole) in a telephonic meeting among management of the Company, the internal auditor and the independent auditor prior to each earnings release.

9.  Review and discuss the annual and quarterly financial statements with management, the internal auditor and the independent auditor, including the Company's specific disclosures made in "Management's Discussion and Analysis of Financial Condition and Results of Operations." Prior to filing of its periodic reports with the Securities and Exchange Commission.

*       *       *

12. Review with management of the Company any significant changes to GAAP policies or standards.

13. Review with management of the Company and the independent auditor at least periodically the Company's critical accounting policies.

14. Review with the Chief Legal Officer legal and regulatory matters that may have a material impact on the financial statements, related Company compliance policies, and programs and reports received from regulators.

15. Review with management of the Company at least periodically the Company's principal financial policies.

44.     Pursuant to the Audit Committee Charter, the Audit Committee is charged with the

following enumerated "Duties and Responsibilities" with respect to oversight of the Company's

internal controls:

19. As required by the Sarbanes-Oxley Act or other applicable rules or regulations, consider and review with management of the Company, the independent auditor, and the internal auditor:

   a.  The Company's and the independent auditor's assessment of the effectiveness of its internal controls, including computerized information system controls and security.

   b.  Any related significant findings and recommendations of the independent public accountants.

20. Review with management of the Company and the independent auditor at the completion of the annual audit:

a.  The Company's annual financial statements and related footnotes.

b.  The independent auditor's audit of the financial statements and its report thereon.

c.  The independent auditor's report on internal controls.

d.  Any significant changes required in the independent auditor's audit plan.

e.  Any serious difficulties or disputes with management of the Company encountered during the course of the audit, including any restrictions on the scope of their work or access to required information.

f.  Significant findings during the year and management's responses thereto.

g.  Other matters related to the conduct of the audit which are to be communicated to the Committee under generally accepted accounting standards.

45.    The Audit Committee is charged with the following enumerated "Risk Oversight Responsibilities" with respect to risk oversight:

21.  Inquire of management of the Company, the internal auditor, and the independent auditor about significant risks or exposures and assess the steps management has taken to minimize such risk to the Company.

22.  Develop and oversee procedures for (i) receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls and auditing matters, and (ii) the confidential, anonymous submission of employee concerns regarding accounting or auditing matters.

23.  Review with management, at least twice annually, the Company's cybersecurity risk exposures and the steps management has taken to monitor or mitigate such exposures.

24.  Conduct or authorize investigations into any matters within the Committee's scope of responsibilities.

46.    Finally, the Audit Committee Charter provides that:

The Committee will have the resources and authority necessary to discharge its duties and responsibilities, including the authority to retain outside counsel or other experts or consultants, as it deems appropriate. Any communications between the Committee and legal counsel in the course of obtaining legal advice will be considered privileged communications of the Company, and the Committee will take all necessary steps to preserve the privileged nature of those communications.

47.    Upon information and belief, the Company maintained an Audit Committee Charter during the period of wrongdoing that imposed the same, or substantially and materially the same or similar, duties on the members of the Audit Committee as those set forth above.

## SUBSTANTIVE ALLEGATIONS

**Background**

48.    3D Systems provides 3D printing and digital manufacturing solutions in North America and South America, Europe and the Middle East, and Asia Pacific and Oceania.  The Company earns revenue from the sale of products and services through its two operating segments: Healthcare Solutions and Industrial Solutions.  The Healthcare Solutions segment includes dental, medical devices, personalized health services, and the Regenerative Medicine Program.

49.    Beginning on August 13, 2024, the Company: (i) understated the impact of weakened customer spending on the company's business while overstating its resilience in challenging industry conditions; (ii) failed to disclose that updated milestone criteria in the UTC Partnership would negatively impact the company's Regenerative Medicine Program revenue; and (iii) as a result, the Company's public statements were materially false and misleading at all relevant times.

### 3D Systems Understates Weakened Customer Spending, Overstates Resilience in Challenging Industry Conditions

50.    The Individual Defendants are responsible for a series of improper statements regarding 3D Systems' financial statements and business condition.  During the period of wrongdoing, the Individual Defendants made false or misleading statements by understating the true impact of weakened customer spending and by overstating the Company's resilience despite challenging industry conditions.  During this time, the Company falsely assured stockholders that it was on track to meet its revenue forecasts.

51.     On August 20, 2024, 3D Systems issued a press release announcing the Company's financial results for the first quarter ended March 31, 2024.  The press release quoted defendant Graves as stating, in relevant part, that the Company was operating in "unfavorable macroeconomic and geopolitical conditions."  Despite acknowledging environmental headwinds, defendant Graves went on to assure investors of his "confidence that [3D Systems'] top-line performance will notably improve as the year progresses."

52.     Nine days later, on August 29, 2024, 3D Systems issued a press release announcing the Company's financial results for the second quarter ended June 30, 2024.  In the press release, defendant Graves reiterated the "ongoing macroeconomic pressures on customer capital spending" but "given [3D Systems'] performance through the first half and current macroeconomic and geopolitical conditions, [the Company is] now targeting revenues for the full-year 2024 in the range of $450 million - $460 million, as [it] anticipate[s] continued sequential revenue improvements in the third and fourth quarters."  Defendant Graves concluded his statement by acknowledging that "conditions remain challenging in the near-term."

53.     That same day, 3D Systems hosted an earnings call with analysts and investors to discuss the Company's first half of 2024 financial results.  During the scripted portion of the earnings call, defendant Graves assured investors, in relevant part, that despite historical and present weakness in customer spending, "[3D Systems'] opportunity pipeline has consistently strengthened since it bottomed down in [the first quarter of 2024]" and the Company expects "continued sales growth in [the third and fourth quarters of 2024]."  Defendant Graves reiterated that "[g]iven all these factors from a timing standpoint, [3D Systems] would expect full company revenues to grow at mid-single-digit rates on a consecutive quarter basis in [the third quarter] and once again in [the

fourth quarter], bringing [the Company's] revenue to roughly $450 million to $460 million for the full year 2024."

54.    On November 26, 2024, 3D Systems issued a press release announcing the Company's financial results for the third quarter ended September 30, 2024.  The press release quoted defendant Graves as assuring investors that the Company is positioned well as "the geopolitical and economic headwinds of the last 18 months ultimately begin to recede."  Defendant Graves further assured investors that the Company expected full year 2024 revenues "to be between $440 million and $450 million."

55.    The following day, on November 27, 2024, 3D Systems hosted an earnings call with analysts and investors to discuss the Company's third quarter financial results.  During the scripted portion of the earnings call, defendant Graves stated, in relevant part, that, "macroeconomic and geopolitical uncertainties have caused [3D Systems'] customers to reduce CapEx spending for new capacity in their factories, which in turn has created a persistent headwind to hardware system sales."  Defendant Graves conceded that "[a]s a consequence, [3D Systems'] revenues were essentially flat on a sequential basis.  This was slightly weaker than [the Company] had anticipated as a few key installations of new systems, which were targeted for acceptance late in [the third quarter], slipped into the fourth quarter."  Despite stagnant sales growth, defendant Graves assured investors that the Company expected "more robust sales as the economic environment improves."

56.    During the question-and-answer portion of the earnings call, when asked about the Company's anticipated future profitability, defendant Graves responded, in pertinent part, that, "we're hopeful revenues will be rising in '25."

57. The above statements were materially false and misleading because they omitted material information about how the Company was performing, despite macroeconomic and geopolitical headwinds.

**The Company Failed to Properly Disclose the Negative Impact on Revenue Caused by Updated Milestone Criteria in the UTC Partnership**

58. ASC 606-10-32-5's revenue recognition standard requires an entity to estimate the amount of variable consideration to which it will be entitled under a contract.

59. On August 13, 2024, 3D Systems filed its Annual Report on Form 10-K for the fiscal year ended December 31, 2023, with the SEC. In the Form 10-K, the Company stated that there had been an amendment to its regenerative medicine collaboration and licensing agreement with a strategic partner. In particular, the Form 10-K stated:

> In connection with the amendment to this collaboration and licensing agreement, the Company concluded that three additional milestone-based payments included in the contract, totaling $6.5 million in the aggregate, became probable of being earned. The inclusion of these additional milestone payments in the contract transaction price resulted in the recognition of additional Healthcare Solutions' services revenue during the year ended December 31, 2023, inclusive of a $4.5 million aggregate cumulative catch-up adjustment to the revenue recorded under the contract.

60. The Form 10-K included Certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by the Officer Defendants, attesting that "[t]he information contained in the Form 10-K fairly presents, in all material respects, the financial condition and results of operations of the [Company]."

61. On November 26, 2024, 3D Systems filed its Quarterly Report on Form 10-Q for the third quarter ended September 30, 2024, with the SEC. In the Form 10-Q, the Company stated:

> We enter into collaboration and licensing arrangements with third parties. The nature of the activities to be performed and the consideration exchanged under these arrangements varies on a contract-by-contract basis. We evaluate these arrangements to determine whether they meet the definition of a customer relationship for which revenue should be recorded and recognized. These contracts may contain multiple performance obligations and may contain fees for licensing,

research and development services, contingent milestone payments upon the achievement of contractual developmental criteria and/or royalty fees based on the licensees' product revenue. We determine the revenue to be recognized under these arrangements based upon an evaluation of the distinct performance obligations; the identification and evaluation of material rights; the estimation of the amount of variable consideration to be included in transaction price, as well as the timing for inclusion of such variable consideration; and the amount of transaction price assigned to and the pattern of transfer of control for each distinct performance obligation.

62.     On November 27, 2024, 3D Systems hosted an earnings call with analysts and investors to discuss the Company's third quarter financial results. During the question-and-answer portion of the earnings call, when asked about milestones in the regenerative business, defendant Graves stated:

> I think we'll see some additional milestones in '25. I wish we could talk more about it, both the precision and the speed at which we can print extremely fine structure now is amazing. And we have multiple paths to the design of those printers for production applications for organs and human body, specifically lungs. So I am really pleased with progress on the technology and the implementation of that for lung manufacturing. So you can expect, we'll be talking about milestones in 2025 that we're hitting and I continue to believe we're on track to be in a position to get to human demonstration on a reasonable timeline. United Therapeutics, our partner in this, will have to speak to that milestone.

63.     Notably, defendant Graves did not disclose the possibility of changes to the UTC Partnership's milestone criteria, or the negative impact such changes could have on the Company's revenues.

64.     The above statements were materially false and misleading because they omitted material information about how changes in the milestone criteria would affect revenue recognition of related milestone payments.

**The Individual Defendants Negligently Made Materially False and Misleading Statements in 3D Systems' 2024 Proxy Statement**

65.     Plaintiff's allegations with respect to the misleading statements in 3D Systems' Proxy Statement are based solely on negligence; they are not based on allegations of reckless or knowing

conduct by or on behalf of the Individual Defendants, and they do not allege and do not sound in fraud.  Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

66.     On August 13, 2024, 3D Systems filed its Proxy Statement on Form DEF14A for the 2024 Annual Meeting of Stockholders, held on August 30, 2024 (the "2024 Proxy"), with the SEC.  In the 2024 Proxy, defendants Graves, Clinton, Drayton, Erickson, Kever, McClure, Moore, and Padmanabhan solicited stockholder votes to obtain approval of the amendment and restatement of the 2015 Incentive Plan that, among other things, increased the number of shares reserved for issuance thereunder by 4,000,000 shares.  The 2024 Proxy was based, in part, on the same alleged misstatements and misrepresentations concerning the Company's financial results, the performance of its Regenerative Medicine Program, and the impact of revised milestone criteria tied to its partnership with UTC, even though there was not a reasonable basis to support these beliefs, as alleged herein.  Defendants Graves, Clinton, Drayton, Erickson, Kever, McClure, Moore, and Padmanabhan negligently issued misleading statements with respect to each of these solicited votes.

**The Truth Begins to Emerge, Despite Defendants' Obfuscation**

67.     On March 26, 2025, 3D Systems issued a press release announcing its financial results for the fourth quarter and full year ended December 31, 2024.  Among several disclosures, 3D Systems reported fourth quarter non-GAAP EPS of -$0.19, missing consensus estimates by $0.08 per share, and sales revenue of $111 million, representing a -3.4% year-over-year decline and missing consensus estimates by $4.17 million.  Further, for the full year of 2024, the Company reported sales of $440.1 million, a decrease of 10% compared to the prior year, driven by "lower hardware systems sales due to macroeconomic factors that are negatively impacting demand."  The press release quoted defendant Graves as stating:

In addition, with the largest installed base in the additive manufacturing industry, we were pleased to see a return to healthy consumable sales across most markets, reflecting higher utilization rates for existing machines. ***These positive changes in our core business units were unfortunately masked by the impact of an accounting estimate change in our Regenerative Medicine program related to refinement of technical acceptance criteria associated with a potential change in testing methodology for printed human lungs, which are the focus of this program.*** This estimate change relates to the incorporation of in vivo human decedent testing protocols, which have recently been successfully demonstrated by our partner, United Therapeutics. While this accounting estimate change was not originally contemplated in our 2024 guidance, I am pleased that our core businesses still delivered within the full-year revenue range communicated in our prior forecast, and that the market showed signs of strengthening in the fourth quarter.

68.    In addition, the press release also quoted defendant Graves as stating:

With our new products now gaining traction in the market, our focus is increasingly centered on driving gross margin expansion and operating expense improvements in the face of continuing uncertainty in the global markets. Given this potential demand profile, we believe it is prudent to undertake further significant actions to reduce costs and improve operating efficiencies to support our long-term mission of delivering growth with sustainable profitability. Our latest cost initiative, which began in Q1 of 2025, is targeted at delivering over $50 million of incremental annualized savings based on actions taken over the next six quarters. ***Importantly, while these efforts will not be fully completed until the middle of 2026, we anticipate significant improvements associated with them, in conjunction with those taken previously, leading us to expect break-even-or-better adjusted-EBITDA performance by the fourth quarter of 2025, despite essentially flat-to-modest revenue growth. From a balance sheet perspective, having previously retired over 50% of our Convertible Notes due November 2026, the remainder of which reaches maturity in Q4 of 2026, our cash balance at 2024 year-end of $171 million, supplemented by proceeds from the sale of our Geomagic software platform for $123 million in the coming weeks, positions us well to continue reducing our leverage while supporting the investments needed to deliver long-term growth and profitability.***

69.    Further, in the press release, 3D Systems revealed its full-year 2025 outlook, stating:

Assuming no material change in current macroeconomic conditions and the expected divestiture of the Geomagic business in early Q2 of 2025, the Company is providing the following for its full year 2025 outlook:

- Revenue within the range of $420 million to $435 million, representing essentially flat to modest growth when excluding Geomagic revenue for the same periods in FY'24

- Non-GAAP Gross Profit Margin within the range of 37% to 39%

- Non-GAAP Operating Expense within the range of $200 million to $220 million

- Adjusted EBITDA to be break even or better in Q4 2025.

70. On March 27, 2025, 3D Systems hosted an earnings call with analysts and investors to discuss the Company's fourth quarter and full year 2024 results. In particular, during the scripted portion of the earnings call, defendant Graves stated:

> With a rise in capacity utilization and increased printer sales in Q4, we are hopeful that we've seen the worst, but only time will tell. *On a more positive note, as the performance, reliability, and economics of 3D printing continuously accelerates, customer interest in production applications continues to rise unabated. In fact, for 3D Systems, the level of customer exploration and engagement in our additive technology has never been higher as reflected in our Application Innovation Group activity, which was up 18% for the year.*
>
> \*       \*       \*
>
> *Over the course of our quarterly earnings releases through the coming year, we plan to expand on these markets for you, including their size potential and strategy on how we win.* In just a few moments, I'll begin this series by diving more into our dental business for this call. *Given the rapid pace of additive technology evolution for both health care and industrial applications, we have great confidence in our longer-term growth prospects.*
>
> \*       \*       \*
>
> *To delve deeper into one of the most significant and immediate strategic growth opportunities in front of us today, which is the dental market.* For our company, dental applications reside in four key pillars, which we categorize as straighten, protect, repair, and replace. These four areas are all converting to a large extent to 3D printing technology, which lowers cost, improves performance, and shortens lead times for the patient.
>
> \*       \*       \*
>
> *Our significant position in the aligner market today gives us a strong foundation to build upon.* At one customer alone, we've deployed fleets of production printers totaling over 600 that operate simultaneously across three continents globally each day and have the ability to print over 1 million custom parts per day. Our expertise in this domain was evidenced in the landmark contract we announced last summer with a leader in the clear aligner space, valued at $0.25 billion to support the production of clear aligners over five years.

With the emergence of technology into direct print aligners, we anticipate further expansion of this market in the coming years, and we plan to lead the way.

*     *     *

***Taken together, the dental opportunity we have in front of us is estimated at over $1 billion in the United States alone, and we are targeting it as one of the largest company priorities going forward.***  So a key question you might ask is, why will we win in this market?

From my standpoint, it's very simple.  Our legacy and current leadership in the well-established aligner market is undeniable***.  The reputation for quality and reliability of our next-gen materials further strengthens our brand in the market each day. Across the entirety of our Healthcare segment, we have the experience and proven track record to bring customized patient solutions to the market, and we have a proven ability to navigate complex regulatory markets having been granted over 100 FDA-cleared and CE-marked devices across our portfolio.***

***Supported by our tenacious approach to innovation, I believe we're best positioned by far to capitalize on this $1 billion market opportunity as dentistry quickly pivots to 3D printing technology for the future.***

71.     On this news, 3D Systems' stock plunged $0.57 per share, or 20.9%, on March 27, 2025, to close at $2.15 per share compared to the previous day's closing of $2.72 per share, erasing over $77.2 million in market capitalization in a single day.  3D Systems' securities nonetheless continued to trade at artificially inflated prices throughout the remainder of the period of wrongdoing because of defendants' continued misstatements and omissions regarding 3D Systems' overstatement of its resilience in challenging industry conditions.

72.     The above statements were materially false and misleading because defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and compliance policies.  Specifically, defendants made false and/or misleading statements and/or failed to disclose that: (i) 3D Systems had understated the impact of weakened customer spending on the Company's business, while overstating its resilience

in challenging industry conditions; and (ii) as a result, the Company's public statements were materially false and misleading at all relevant times.

## THE TRUTH EMERGES

73.     On May 12, 2025, after the market closed, 3D Systems issued a press release announcing its financial results for the first quarter ended March 31, 2025.  In particular, the press release stated:

> 3D Systems ... announced today its financial results for the first quarter ended March 31, 2025.
>
> • Revenue of $95 million as growth in new hardware systems and related services was offset by a decline in materials sales driven primarily by inventory management in the dental aligner market.

*        *        *

| Unaudited | | | | |
|---|---|---|---|---|
| *(in millions, except per share data)* | | **March 31, 2025** | | **March 31, 2024** |
| Revenue | $ | 94.5 | $ | 102.9 |
| Gross profit | $ | 32.7 | $ | 40.9 |
| Gross profit margin | | 34.6 % | | 39.8 % |
| Operating expense | $ | 69.5 | $ | 80.8 |
| Operating loss | $ | (36.8) | $ | (39.9) |
| Net loss attributable to 3D Systems Corporation | $ | (37.0) | $ | (16.0) |
| Diluted loss per share | $ | (0.28) | $ | (0.12) |
| | | | | |
| Non-GAAP measures for year-over-year comparisons | | | | |
| Non-GAAP gross profit margin | | 35.0 % | | 40.1 % |
| Non-GAAP operating expense | $ | 61.6 | $ | 66.3 |
| Adjusted EBITDA | $ | (23.9) | $ | (20.1) |
| Non-GAAP diluted loss per share | $ | (0.21) | $ | (0.17) |

*Three Months Ended*

*        *        *

**2025 Outlook**

***Due to the risk of protracted weakness in customer capital investment spending, the Company is withdrawing full year guidance for 2025*** as it continues to focus on delivering profitability at its current scale.  The Company believes with its strong new product portfolio, spanning all metal and polymer platforms, it is well-positioned for accelerated growth and profitability when customer spending on capex rebounds.

74.     On this news, 3D Systems' stock plunged $0.68 per share, or 26.6%, on May 13, 2025, to close at $1.87 per share compared to the previous day's closing of $2.55 per share, erasing over $92.7 million in market capitalization in a single day.

75.     Market analysts were quick to comment on the Company's disappointing results. For example, on May 14, 2025, an analyst-contributor for *Seeking Alpha* wrote:

> 3D Systems ... reported terrible results in the first quarter, which appears to have been driven by weak materials sales to dental alignment customers.  The company also appears bearish about the impact of tariffs on its business, although this won't show up in its financials until Q2.  The poor results aren't necessarily surprising given Materialise's (MTLS) disappointing Q1 software revenue and Align Technology's (ALGN) recent soft growth.  ***It does call into question the health of the business and 3D Systems' path to profitability, though.***

> \*       \*       \*

> ***[T]he company's problems appear larger than ever. A soft demand environment, mounting competition, and customer concentration are all significant issues.***  As a result, there is a view that there may be better ways to capitalize on additive manufacturing than through hardware companies.

> \*       \*       \*

> 3D Systems' gross margin declined in Q1, driven by pricing pressure, revenue mix, and lower volumes.  This represents a continuation of trends that have been present for the better part of 5 years.

> \*       \*       \*

> ***3D Systems' business continues to deteriorate, and this is before the uncertainty created by tariffs hits its equipment sales.  While cost-cutting could move the company closer to breakeven, 3D Systems has been suggesting profitability is imminent for some time, while making little actual progress.***

> ***After the most recent price drop, 3D Systems could be considered reasonably priced.  However, the stock could have further to fall, given the lack of investor interest in the additive manufacturing space.***  With the Geomagic cash, 3D Systems' enterprise value now sits at around $300 million, against approximately a $350-400 million revenue run-rate going forward.  This hardly screams bargain for an unprofitable company with a shrinking revenue base.

76.    As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, 3D Systems has suffered significant losses and damages.

## DAMAGES TO 3D SYSTEMS

77.    As a result of the Individual Defendants' wrongful conduct, 3D Systems disseminated false and misleading statements and omitted material information to make such statements not false and misleading when made.  The improper statements have devastated 3D Systems' credibility.  3D Systems has been, and will continue to be, severely damaged and injured by the defendants' misconduct.

78.    As a direct and proximate result of the Individual Defendants' actions as alleged above, 3D Systems' market capitalization has been substantially damaged.  From the time the Individual Defendants made their improper statements until the truth emerged, 3D Systems' stock price has dropped over 26.6%, or $0.68 per share.

79.    Further, as a direct and proximate result of the Individual Defendants' conduct, 3D Systems has expended, and will continue to expend, significant sums of money.  Such expenditures include, but are not limited to:

(a)    costs incurred from defending and paying any settlement or judgment in the Security Class Action for violations of federal securities laws;

(b)    costs incurred to investigate wrongdoing in connection with the improper financial disclosures and statements;

(c)    costs incurred in connection with remediating internal control deficiencies;

(d)    costs incurred from compensation and benefits paid to the Individual Defendants, which compensation was based at least in part on 3D Systems' artificially-inflated stock price; and

(e)    significant loss in market capitalization of the Company.

80.    Moreover, the Individual Defendants' actions have irreparably damaged 3D Systems' corporate image and goodwill.  For at least the foreseeable future, 3D Systems will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that 3D Systems' ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

81.    Plaintiff brings this action derivatively in the right and for the benefit of 3D Systems to redress injuries suffered, and continue to be suffered, by 3D Systems, as a direct result of the Individual Defendants' violation of securities law, non-exculpable breaches of fiduciary duties, and unjust enrichment.  3D Systems is named as a nominal defendant solely in a derivative capacity.

82.    Plaintiff will adequately and fairly represent the interests of 3D Systems in enforcing and prosecuting its rights.

83.    Plaintiff was a stockholder of 3D Systems at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current 3D Systems stockholder.

84.    The 3D Systems Board currently consists of the following nine individuals: defendants Graves, Clinton, Drayton, Erickson, Kever, McClure, Moore, and Padmanabhan; and non-party John J. Tracy.  Plaintiff has not made any demand on the Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

**Demand Is Futile Because at Least a Majority of the Board Faces a Substantial Likelihood of Liability for Their Misconduct**

85.     At least a majority of the Director Defendants face a substantial likelihood of personal liability for their breaches of the duties of trust, loyalty, good faith, and due care described herein.  Plaintiff has adequately alleged that all, or at least a majority, of the Director Defendants are not capable of disinterestedly and/or independently considering a demand to commence and vigorously prosecute this action.  For the following reasons, and for reasons detailed elsewhere in this Complaint, Plaintiff has not made, and should be excused from making, a pre-suit demand on the Board to initiate this action because making a demand would be futile.

86.     The Company has been, and will continue to be, exposed to significant losses due to the wrongdoing complained of herein.  And yet, the Director Defendants have not caused the Company to take action to recover the damages it has suffered and will continue to suffer thereby.

87.     The Director Defendants were each directors throughout the period of wrongdoing, and as such had a fiduciary duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations on behalf of the Company concerning its financial and business prospects were accurate.

88.     The Director Defendants knew of the false and misleading statements that were issued on the Company's behalf, and none of them took any steps in a good faith effort to prevent or remedy that situation.

89.     As alleged above, 3D Systems knew it faced macroeconomic and geopolitical headwinds beginning on August 13, 2024, and despite such adverse factors, the Company issued false and misleading statements concerning the Company's financial results, the performance of its Regenerative Medicine Program, and the impact of revised milestone criteria tied to its partnership with UTC, even though there was not a reasonable basis to support these beliefs.

- 32 -

90.     In this context, the Director Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such misleading statements as primary violations of the federal securities laws.

91.     The Director Defendants, by virtue of possessing information reflecting the true facts regarding the Company, and their control over and/or receipt and/or modification of the Company's allegedly materially misleading misstatements, were active and culpable participants in the fraudulent scheme alleged herein.

92.     Each of the Director Defendants knowingly approved and/or permitted the wrongs alleged herein and/or participated in efforts to conceal or disguise those wrongs from the Company's stockholders and are therefore not disinterested parties.

93.     Because each of the Director Defendants authorized and/or permitted false statements alleged herein to be disseminated directly to the public and made available and distributed to stockholders, authorized and/or permitted the issuance of various false and misleading statements, and were principal beneficiaries of the wrongdoing alleged herein, the Director Defendants could not fairly and fully prosecute such a suit even if they instituted it.

94.     The Director Defendants also owed a duty, in good faith and with due diligence, to exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls and/or internal auditing and accounting controls over financial reporting were sufficiently robust and effective (and/or were being implemented effectively), and to ensure that the Audit Committee's duties were being discharged in good faith and with the required diligence and due care.  Instead, the Director Defendants knowingly reviewed, authorized, and/or caused the publication of materially false and misleading statements throughout the period of wrongdoing that caused the Company's stock to trade at artificially inflated prices.

95.     Because of their participation in the gross dereliction of fiduciary duties, and breaches of the duties of due care, good faith, and loyalty, defendants Graves, Clinton, Drayton, Erickson, Kever, McClure, Moore, and Padmanabhan face a substantial likelihood of liability, making demand upon them futile.

96.     The Director Defendants also wasted corporate assets by paying improper compensation to certain of the Company's executive officers and directors.  The handsome remunerations paid to wayward fiduciaries who proceeded to breach their fiduciary duties to the Company was improper and unnecessary, and no person of ordinary, sound business judgment would view this exchange of consideration for services rendered as fair or reasonable.

97.     The Director Defendants' making or authorization of false and misleading statements throughout the period of wrongdoing, failure to timely correct such statements, failure to take necessary and appropriate steps to ensure that the Company's internal controls or internal auditing and accounting controls were sufficiently robust and effective (and/or were being implemented effectively), failure to take necessary and appropriate steps to ensure that the Audit Committee's duties were being discharged in good faith and with the required diligence, and/or acts of corporate waste constitute breaches of fiduciary duties, for which the Director Defendants face a substantial likelihood of liability.  If the Director Defendants were to bring a suit on behalf of 3D Systems to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability.  This is something they have not done and will not do.  Thus, defendants Graves, Clinton, Drayton, Erickson, Kever, McClure, Moore, and Padmanabhan are breaching their fiduciary duties to the Company and face a sufficiently substantial likelihood of liability for their breaches, rendering any demand upon them futile.

98.     The Company, at all material times, maintained its Code of Conduct and related corporate governance policies.  These policies required each of the Individual Defendants to maintain the highest standards of honesty and integrity, particularly in relation to accurate and truthful public disclosures.  And yet, despite such written policies, each of the Director Defendants failed to ensure that the Company upheld these high standards of integrity, misrepresented facts to the investing public, and failed to report any concerns, investigate any misconduct, or commence litigation against the Individual Defendants.

99.     In violation of the Code of Conduct, the Director Defendants conducted little, if any, oversight of the Company's involvement in the Individual Defendants' scheme to cause the Company to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violation of securities law, including breaches of fiduciary duty and unjust enrichment.  In further violation of the Code of Conduct, the Director Defendants failed to comply with laws and regulations, failed to maintain the accuracy of company records, public reports, and communications, and failed to uphold the responsibilities related thereto.

100.    The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment, as it was based on bad faith and intentional, reckless, or disloyal misconduct.  None of the Director Defendants therefore can claim exculpation from their violations of duty pursuant to the Company's Charter (to the extent such a provision exists).

101.    For these reasons, each of the Director Defendants, and at least a majority of them, cannot reasonably consider a demand with the requisite disinterestedness and independence; demand on defendants Graves, Clinton, Drayton, Erickson, Kever, McClure, Moore, and Padmanabhan therefore is futile.

**Demand Is Futile as to the Audit Committee Defendants**

102.    The Audit Committee Defendants, defendants Drayton, Erickson, and Moore, were responsible for, among other things, reviewing and approving quarterly and annual financial statements and earnings press releases, overseeing 3D Systems' internal controls over financial reporting, and discharging their other duties described herein.

103.    Despite these duties, the Audit Committee Defendants knowingly or recklessly reviewed and approved, or failed to exercise due diligence and reasonable care in reviewing and preventing the dissemination of false and/or materially misleading earnings press releases and earnings guidance, and failed in their specific duties to ensure that the Company's internal controls over financial reporting were sufficient and that statements made by the Company regarding its business and financial prospects were accurate.

104.    Accordingly, the Audit Committee Defendants face a sufficiently substantial likelihood of liability for breach of their fiduciary duties of loyalty and good faith.  Any demand upon the defendants Drayton, Erickson, and Moore therefore is futile.

**Demand Is Futile as to Defendants Graves, Drayton, Erickson, Kever, McClure, Moore, and Padmanabhan for Violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9 Promulgated Thereunder**

105.    Defendants Graves, Drayton, Erickson, Kever, McClure, Moore, and Padmanabhan are responsible for issuing the 3D Systems' materially misleading proxy statements.  It is against public policy to indemnify individuals for violations of section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.  As such, any indemnification provided by the Company to defendants Graves, Drayton, Erickson, Kever, McClure, Moore, and Padmanabhan does not protect them for violations of section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder in the Company's proxy statements.  Accordingly, defendants Graves, Drayton,

Erickson, Kever, McClure, Moore, and Padmanabhan face a substantial likelihood of liability, thereby excusing demand.

**Demand Is Futile as to Defendant Graves**

106.    As alleged above, defendant Graves breached his fiduciary duty of loyalty by making or causing the Company to make improper statements in the Company's press releases, SEC filings, and earnings conference calls.  In addition to the reasons discussed above as to why demand is futile as to at least a majority of the Director Defendants, demand is futile as to defendant Graves because he cannot disinterestedly consider a demand to bring suit against himself because he is the Company's current President and CEO.

107.    Defendant Graves personally reviewed, signed, authorized, and/or made the false and misleading statements alleged herein during earnings calls, in SEC filings, press releases, and in other public forums.  Defendant Graves, therefore, as a main perpetrator of the wrongdoing alleged herein, is irreconcilably conflicted, faces a substantial likelihood of liability, and cannot consider a demand to bring suit.

108.    There is reason to doubt that defendant Graves is capable of independently considering a demand to commence and vigorously prosecute this action because defendant Graves' principal professional occupation is his employment as President and CEO of 3D Systems.  As President and CEO of the Company, defendant Graves has earned and stands to earn hundreds of thousands of dollars in annual salary, bonuses, and other compensation, in part, at the discretion of the Board.  Accordingly, defendant Graves is incapable of independently considering a demand to commence and vigorously prosecute this action against the defendants who control his annual compensation.  Indeed, it is admitted in the Company's Proxy Statement on Form DEF14A for the 2025 Annual Meeting of Stockholders, held on May 16, 2025 (the "2025 Proxy"), and filed with

the SEC on April 4, 2025, that the Board has determined that defendant Graves is not an independent director. Defendant Graves, who is also a current director, therefore, faces a substantial likelihood of liability for his breach of fiduciary duties, making any demand upon him futile.

**Demand Is Futile as to Defendant Drayton**

109.    According to 3D Systems' Current Report on Form 8-K filed with the SEC on May 20, 2025, the Company's stockholders voted against re-electing defendant Drayton to serve as a Company director.[1]  As such, defendant Drayton is now, and has been since the Annual Meeting of Stockholders on May 16, 2025, a "holdover director" under Delaware law and is serving on the Board until her successor is elected and qualified or until her earlier resignation or removal.

110.    Because defendant Drayton does not have the backing of the Company's stockholders and is due to be replaced, defendant Drayton is incapable of considering a demand to sue or taking action against the Individual Defendants.

111.    Furthermore, should the Company's Compliance, Corporate Governance and Sustainability ("CCGS") Committee and/or the Board reject defendant Drayton's resignation,[2] then defendant Drayton would not be able to independently consider a demand to sue defendants Clinton and Padmanabhan (the directors on the CCGS Committee) or the other Director Defendants that considered the CCGS Committee's recommendation because she would owe her continued service on the Company's Board to those Director Defendants.  Additionally, in that scenario, defendants Clinton and Padmanabhan and/or the other Director Defendants would also lack the ability to

---

[1] Company stockholders cast 28.6 million votes for defendant Drayton's re-election and 33.3 million votes against.

[2] Per the Company's Corporate Governance Guidelines, each director must submit an advance, contingent, and irrevocable resignation that the Board may accept if stockholders do not re-elect that director.  Accordingly, defendant Drayton must submit this resignation to the Board.

consider a demand to bring suit as, given they would have gone against the Company's stockholders' wishes with respect to an election result for another director, it is unlikely that they would then acquiesce to a stockholder demand and investigate or take action against the Individual Defendants, including themselves.

**Demand Is Futile as to Defendant Padmanabhan**

112.    As stated in the Company's 2025 Proxy, defendant Padmanabhan is an executive officer of Smith+Nephew, a customer of the Company that purchased software and on-demand services from 2021 through 2024.  As such, defendant Padmanabhan could not reasonably consider a demand to sue the other Individual Defendants, which, in turn, could adversely impact the services provided to his employer.

**Demand Is Futile as to Defendant Erickson**

113.    As noted in the Company's 2025 Proxy, defendant Erickson is a nonexecutive member of the board of directors of MW Industries, LP, the parent company of a customer of the Company that purchased healthcare services from the Company from 2021 through 2023 in arm's-length transactions similar to those offered in other third-party transactions.  As such, defendant Erickson is conflicted by virtue of his overlapping director roles and could not reasonably consider a demand to sue the other Individual Defendants, which, in turn, could adversely impact the services provided to the subsidiary of the company he serves as director and to which he owes fiduciary duties.

**Demand Is Futile as to Defendants Erickson and Kever**

114.    Defendants Erickson and Kever have a pre-existing professional relationship stemming from at least 2004, thus compromising their independence from one another.   In particular, defendant Erickson served as a director of Luminex Corporation ("Luminex") from 2004

through 2021.  Meanwhile, defendant Kever also served as a director of Luminex continuously from 1996 through at least 2022.  Thus, between 2004 and 2021, defendants Erickson and Kever worked together and built a professional relationship while at Luminex.  As a result of the foregoing, defendants Erickson and Kever are incapable of impartially considering a demand to sue each other.

## COUNT I

**Against the Director Defendants for Violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9 Promulgated Thereunder**

115.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

116.    The claims against the Director Defendants for violation of section 14(a) of the Exchange Act alleged herein are based solely on negligence.  They are not based on any allegation of reckless or knowing conduct by or on behalf of the Director Defendants.  The section 14(a) Exchange Act claims alleged herein do not allege and do not sound in fraud.  Plaintiff specifically disclaims any allegation of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the non-fraud claims.

117.    The Director Defendants negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to stockholders which were contained in the 2024 Proxy.  In the 2024 Proxy, the Board solicited stockholder votes to approve executive compensation, including the amendment and restatement of the 2015 Incentive Plan.

118.    The 2024 Proxy, however, misrepresented and failed to disclose that: (i) the Company's portrayal of resilience in the face of significant industry headwinds was not made on any reasonable basis; (ii) changes in the UTC milestone payments would have a significant impact on revenue; (iii) the Company failed to maintain adequate disclosure controls and procedures with respect to 3D Systems' operations; (iv) the Board failed to implement a reasonable, meaningful, and

well-constituted system of internal controls to ensure that changes to revenue recognition related to the UTC Partnership and significant risks affecting the revenue forecast were timely brought to the Board's attention; and (v) 3D Systems faced reputational harm when the truth would inevitably emerge to investors.  By reason of the conduct alleged herein, the Director Defendants violated section 14(a) of the Exchange Act.  As a direct and proximate result of these defendants' wrongful conduct, 3D Systems misled and/or deceived its stockholders by making misleading statements that were an essential link in stockholders voting to approve the proposed executive officer compensation, including the amendment and restatement of the 2015 Incentive Plan.

119.    The misleading information contained in the 2024 Proxy was material to 3D Systems' stockholders in determining whether or not to approve the proposed executive officer compensation, including the amendment and restatement of the 2015 Incentive Plan.  The proxy solicitation process in connection with the 2024 Proxy was an essential link in the decision to approve the proposed executive officer compensation, including the amendment and restatement of the 2015 Incentive Plan.

120.    Plaintiff, on behalf of 3D Systems, thereby seeks relief for damages inflicted upon the Company based upon the misleading 2024 Proxy in connection with the approval votes for the proposed executive officer compensation, including the amendment and restatement of the 2015 Incentive Plan.

## COUNT II

### Against the Individual Defendants for Breach of Fiduciary Duties

121.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

122.    The Individual Defendants owed 3D Systems fiduciary obligations as detailed herein.  By reason of their fiduciary relationships, the Individual Defendants owed 3D Systems the highest obligations of good faith, trust, loyalty, and due care.

123.    The Individual Defendants violated and breached their fiduciary duties good faith, trust, loyalty, and due care.  More specifically, the Individual Defendants each knowingly, recklessly, or negligently approved the issuance of false statements that misrepresented and failed to disclose material information concerning the Company.  In addition, the Individual Defendants each knew, were reckless, or were grossly negligent in not knowing that material weaknesses existed in the Company's internal controls, and by permitting the improper activity concerning the Company's internal financial controls.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

124.    The Director Defendants further breached their fiduciary duties by awarding themselves unjust and unwarranted compensation throughout the period of wrongdoing.

125.    The Audit Committee Defendants additionally breached their fiduciary duties by reviewing and approving of the misstatements described herein which were made during their tenure on the Audit Committee, and which they knew or were reckless in not knowing contained improper statements and omissions.  The Audit Committee Defendants completely failed in their duty of oversight and in their duty to appropriately review and approve the Company's statements, as required by the Audit Committee Charter.

126.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, 3D Systems has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

127.    Plaintiff, on behalf of 3D Systems, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Unjust Enrichment

128.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

129.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of 3D Systems.

130.    The Individual Defendants were unjustly enriched because of the compensation they received while breaching their fiduciary duties owed to 3D Systems. Plaintiff, as a stockholder and representative of 3D Systems, seeks restitution from Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants from their wrongful conduct and fiduciary breaches.

131.    Plaintiff, on behalf of 3D Systems, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Against all defendants and in favor of the Company for the amount of damages sustained by the Company as a result of defendants' violation of the Exchange Act, breach of fiduciary duty, and unjust enrichment;

B.    Directing 3D Systems to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect 3D Systems and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation, and taking such other action as may be necessary to place before stockholders for a vote the following corporate governance proposals or policies:

      1.      a proposal to strengthen the Board's supervision of operations and compliance with applicable state and federal laws and regulations;

      2.      a proposal to strengthen the Company's internal reporting and financial disclosure controls;

      3.      a proposal to develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

      4.      a proposal to strengthen the Company's procedures for the receipt, retention, and treatment of complaints received by the Company regarding internal controls;

      5.      a provision to appropriately test and then strengthen the Company's internal operational control functions; and

      6.      a provision to nominate at least one new independent member of the Board.

C.      Extraordinary equitable or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that Plaintiff on behalf of 3D Systems has an effective remedy;

D.      Awarding 3D Systems restitution from the defendants, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

E.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated:  August  28, 2025

**COOCH & TAYLOR, P.A.**

*/s/ Blake A. Bennett*

Blake A. Bennett (#5133)
1000 N. West St., Suite 1500
Wilmington, DE 19801
Telephone: (302) 984-3800
Facsimile: (302) 984-3939
Email:  bbennett@coochtaylor.com

**ROBBINS LLP**
Brian J. Robbins
Craig W. Smith
Shane P. Sanders
5060 Shoreham Place, Suite 300
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
Email:  brobbins@robbinsllp.com
csmith@robbinsllp.com
ssanders@robbinsllp.com

*Attorneys for Plaintiff*